# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CAUSE NO.: 1:09-CR-10-TS |
| | ) | |
| DERRICK L. BULLOCK | ) | |

## OPINION AND ORDER

Before the Court is a Motion to Suppress Evidence [DE 15] filed by Defendant Derrick L. Bullock on February 18, 2009. After an evidentiary hearing and post-hearing briefing by the parties, the Motion is now ripe for the Court's ruling. For the reasons stated in this Opinion and Order, the Motion will be denied.

## BACKGROUND

A house located in Fort Wayne, Indiana, became the subject of a narcotics investigation after the police received a tip that someone was selling drugs out of the house. After the police conducted surveillance of the house at 2815 Euclid Street, including its occupants and visitors, the Defendant became the main target of their investigation. The police obtained a search warrant to look for and seize evidence of drug trafficking inside the house at 2815 Euclid Street, which they executed on December 2, 2008. Just prior to execution of the warrant, the Defendant left the residence with Sabrina Wilhelm and became a passenger in the car she was driving. Their vehicle was quickly stopped by police on information that Wilhelm's driving privileges were suspended. Police transported the Defendant back to 2815 Euclid Street while they searched the residence. After finding evidence of drug use and dealing, police arrested the Defendant for visiting a common nuisance. Police transported the Defendant to the Fort Wayne Police

Department and conducted a strip search. During this search, they discovered sixteen individually wrapped baggies of crack cocaine. These drugs provide the basis for the Government's Indictment in this case, filed on January 28, 2009, which charges the Defendant with knowingly possessing with intent to distribute cocaine base, commonly known as "crack," in violation of 21 U.S.C. § 841(a)(1).

On February 18, the Defendant moved to suppress as evidence all items seized from him, claiming that they were obtained as a result of an illegal detention. In his Motion, the Defendant argued that the police had no basis for the initial traffic stop or his subsequent detention and arrest. The Government responded that the stop and detention were permissible under both *Michigan v. Summers*, 452 U.S. 692 (1981), and *Terry v. Ohio*, 392 U.S. 1 (1968), because the police have the authority to detain occupants of a premises while they execute a search warrant, and because the police had reason to believe that the Defendant was about to be engaged in criminal activity. The Defendant filed a reply in which he asserted that an evidentiary hearing would be necessary to ascertain facts pertaining to the basis for the search of the residence and the connection between the Defendant and the residence.

On May 13, the Court conducted an evidentiary hearing on the Defendant's Motion to Suppress Evidence. The Defendant was present in court with his attorney, Stanley Campbell. The Government was represented by AUSA Leslie Miller. Fort Wayne Police Department Detective John Greenlee and Officer John Gigli testified for the Government. The Defendant testified on his own behalf and called as witnesses Sabrina Wilhelm and Patty Eley. The Court received exhibits from the Government and the Defendant. At the conclusion of the hearing, the Defendant rested but requested additional time to consider a continuance of the hearing. During

subsequent telephone conferences, the Defendant requested, and was granted, additional time to review evidentiary matters. On July 1, the parties stipulated to continuing the evidentiary hearing. However, on July 14, the parties advised the Court that they had reached an agreement regarding certain evidence. The Court directed the Defendant to file a stipulation regarding the evidence, and gave the parties additional time to file post-hearing briefs.

On August 6, the Defendant filed the stipulation of the parties regarding the mailing address that the office of the Prosecuting Attorney for Allen County used to contact the Defendant. On August 17, the Defendant submitted his Brief in Support of Motion to Suppress Evidence [DE 35], maintaining that police did not have the authority to detain him while they executed the search warrant and did not have probable cause to arrest him. On October 2, the Government filed its Response to Defendant's Motion to Suppress [DE 38]. The Government argues that the police had sufficient justification to detain the Defendant to arrest him on the basis of contraband found during the search. On October 21, the Defendant filed his Reply Brief [DE 39].

## FINDINGS OF FACTS

The following facts are derived from the testimony of witnesses and the exhibits. The Court finds that the factual matter addressed by the parties' stipulation is not germane to the issues before the Court on the Motion to Suppress.

On December 2, 2008, the Fort Wayne Police Department executed a search warrant at 2815 Euclid Street. Fort Wayne Police Department Detective John Greenlee, who had worked in the Vice and Narcotics division for about 11 years, participated in the execution of the search

and the investigation leading up to its issuance. The investigation began when, on November 3, 2008, someone called the police to report that a person known as "Quick" was selling narcotics from a house on Euclid Street. The caller did not know the address of the house, but was able to describe it in detail, having been inside the house and having talked to Quick. Detective Greenlee had not worked with the caller before as a source and began an investigation to attempt to verify the information provided by the caller.

Through his investigation, Greenlee discovered that the Defendant, Derrick L. Bullock, was known to be called Quick. From the detailed description of the house, he was also able to pinpoint the address as 2815 Euclid Street. Greenlee conducted surveillance of the house at 2815 Euclid Street, either by driving past the house or staying in a position where he could see the house for an extended time. Greenlee first saw the Defendant at 2815 Euclid Street on November 21, 2008, at around 7:10 p.m. when he saw the Defendant and a female leave the house and drive away in a black Dodge Charger with the Defendant driving.[1] On December 1, Greenlee saw the Defendant leave the house and drive away in a white Chevy Impala. On both dates, surveillance revealed that the Defendant engaged in the following activity after driving away from the house:

> [T]he vehicle makes several short stops, sometimes meeting people as they were waiting on the porch. The person would come off the porch, they would turn into an alley. The person would get in the back seat of the car, the person would be in the car two to five minutes, and then get out of the vehicle on foot, step in the house and the vehicle would leave.
> The vehicle would pull up along a side street, the person would approach it, um, be at the window for up to a minute, a very short period of time and then walk away. The vehicle would leave again.

(Supp. Hr'g Tr. 51.) Greenlee testified that the vehicle conducted several of these short visits

---

[1] Later, police conducted a traffic stop on the Charger and learned that the female was Sabrina Wilhelm. The record does not reveal the basis of the stop. However, it does reveal that the Defendant was arrested during the stop and that the Charger was towed because Wilhelm's driver's license was suspended.

4

during surveillance, and that, based on his experience in Vice and Narcotics, he believed that the persons inside the vehicle were selling drugs. Additionally, during the November 21 traffic stop, the Defendant was searched incident to arrest and $500, mostly in $20 denominations, was recovered. Greenlee testified that the Defendant was not employed and that, based on his training and experience, his opinion was that the money was obtained from drug sales. No drugs were recovered during the search.

Greenlee saw the Defendant come out of Euclid address residence on one other occasion between November 21 and December 1. On this occasion, he got in the White Chevy Impala, but Greenlee did not follow him.

On December 2, 2009, the police obtained a search warrant for the house at 2815 Euclid Street to search for evidence of narcotics. The police made plans to execute the warrant that same day. At 2:25 p.m., Greenlee was conducting pre-raid surveillance when he saw Wilhelm exit the house with children and get in the Impala. The Defendant came out next and got in the passenger side. As they drove away, Greenlee and other officers followed the Impala. Greenlee knew from the November 21 traffic stop that Wilhelm driver's license was suspended. After he passed this information along to uniformed Officers Angie Reed and John Gigli, they conducted a traffic stop of the Impala about 10–15 blocks away from the house (or within 3 minutes of the car leaving the house). Greenlee went back to the house to take part in the search, while Officers Gigli and Reed stayed with the Impala. Wilhelm was informed of the search warrant and gave an officer keys to the house at 2815 Euclid Street. Wilhelm told the police that she had marijuana in the house. The police intended to bring both Wilhelm and the Defendant back to the house during the search. However, because Wilhelm's children were in the car with her, she was not

5

immediately transported to the house. Instead, the police contacted the children's father to come get them before they would transport Wilhelm to the house. The police wanted to read Wilhelm and the Defendant the search warrant and to detain them for further investigation.

About ten minutes after stopping the Impala, Officer Gigli transported the Defendant back to 2815 Euclid Street and kept him handcuffed in the caged portion of his squad car. The Defendant was advised of the search warrant and it was read to him. The search was already underway.

During the search of the house, officers found a lighter and a box of marijuana on the dining room table, a large ball of plastic baggies which, when unwrapped, were found to contain small amounts of crack cocaine, a gun in the upstairs bedroom, and a digital scale. Detective Greenlee testified that, based on his training and experience, the items found inside the residence are consistent with the use and distribution of narcotics. Greenlee testified that "you could not have walked through the house without seeing the drugs there in plain view." (Supp. Hr'g Tr. 45.)

The Defendant had been detained inside the squad car at the house for about twenty minutes when Officer Gigli was directed to transport him to the police station. The Defendant was arrested for visiting a common nuisance on the basis of the evidence discovered in the house. At the police station, crack cocaine with a bag weight of about 14 grams was recovered from the Defendant's buttocks during a strip search.

For his booking report, the Defendant provided 1238 Eliza Street as his address. The Defendant lived at that address with his grandmother after his release from the Department of Corrections in March 2008. He moved to a different address on Roxanna Drive six to eight

months later, and lived there until the time of his arrest.

**DISCUSSION**

The Defendant argues that the initial traffic stop, his transport to and continued detention at the house during the execution of the search, and his arrest for visiting a common nuisance were all improper. Accordingly, he submits that the search of his person after his arrest was also illegal and the contraband discovered during the search must be suppressed.

**A.      Pre-Arrest Detention**

The Fourth Amendment requires searches and seizures to be reasonable. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). "As a general matter, both searches and seizures must be conducted pursuant to a warrant or based on probable cause." *United States v. Burns*, 37 F.3d 276, 278 (7th Cir. 1994) (citing *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989)). However, the Supreme Court has developed several exceptions to the warrant and probable cause requirements.

Under the principles established in *Terry v. Ohio* and its progeny, even without probable cause, law enforcement officers "may conduct an investigatory stop, limited in scope and executed through the least restrictive means reasonable." *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). In order to make an investigatory stop, an officer needs only reasonable suspicion supported by articulable facts that criminal activity is afoot. *Terry*, 392 U.S. at 30; *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000). The Supreme Court defined a reasonable suspicion as "some objective manifestation that the

person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981).

In *Michigan v. Summers*, 452 U.S. 692 (1981), the Supreme Court held that it was reasonable for police to detain an individual whom they encountered leaving a house that they were about to search for narcotics pursuant to a search warrant. *Id.* at 705 (holding that "for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted") (footnotes omitted). Relying on *Terry* and other cases involving reasonable detentions on less than probable cause, the Court reasoned:

> These cases recognize that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity. . . . They are consistent with the general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause. But they demonstrate that the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams* [*v. Williams*, 407 U.S. 143 (1972)].

*Summers*, 452 U.S. at 699–700 (footnotes omitted). The Court upheld the constitutionality of the pre-arrest seizure based on several factors. The Court noted that the search warrant had been issued by a "neutral and detached magistrate" who had probable cause to believe that the law was being violated in the house. *Id.* at 701. According to the Court, detention of the owner, while a "significant restraint on his liberty, was surely less intrusive than the search itself." *Id.* (footnote omitted). The Court also reasoned that because the detention took place in the owner's residence, "it could only add minimally to the public stigma associated with the search itself and

8

would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Id.* at 702. Consequently, the Court concluded that the detention was "'substantially less intrusive' than an arrest." *Id.* (quoting *Dunaway v. New York*, 442 U.S. 200, 210 (1979)). Against this, the Court weighed "the law enforcement interest and the nature of the 'articulable facts' supporting the detention." *Id.* The Court identified three law enforcement interests:

> Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. Finally, the orderly completion of the search may be facilitated if the occupants of the premises are present. Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.

*Id.* at 702–03 (footnotes and citations omitted). Regarding the "nature of the articulable and individualized suspicion" on which police based the detention, the Court stated that the search warrant "provides an objective justification for the detention." *Id.* at 703.

> A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.

*Id.* at 703–04 (footnote omitted). The Court concluded that "[i]f the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain

9

while officer of the law execute a valid warrant to search his home." *Id.* at 704–05.

The Defendant argues that the circumstances of his case do not fit within the *Summers* exception. The Defendant maintains that for police to detain a person during the execution of a search warrant, that person must be present at the residence at the time the search is taking place, which would make that person an occupant. If the person is not present, the police may only detain him if he is a resident—merely having been an occupant at some previous time would not be sufficient. The Defendant submits that because he was only an occasional visitor of the Euclid Street address, and he was not present at the house when the search was underway, it was not reasonable for the police to detain him and bring him back to the residence.

The Court finds, based on the totality of circumstances, that the detention of the Defendant during the execution of the search, and until police had probable cause to arrest him for visiting a common nuisance, was reasonable.[2] His pre-arrest seizure was justified by the nature of the articulable and individualized suspicion on which the police based the Defendant's detention, and the law enforcement interest in preventing flight. The Court will address these in turn.

First, a neutral magistrate, rather than an officer in the field, made the critical determination to give the police special authorization to enter the home at 2815 Euclid Street. "The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Summers*, at 703; *see also United States v. Jennings*, 544 F.3d 815, 818 (7th Cir. 2008) (stating that one of the reasons that police may detain . . . Is that "probable cause

---

[2] The Defendant also challenges whether the police had probable cause to arrest him for visiting a common nuisance. The Court will address this argument later in this Opinion and Order.

underlying a warrant to search a premises give police reason to suspect that its occupants are involved in criminal activity."(citing *Summers*)). In *Jennings*, the Seventh Circuit held that officers were justified in detaining a man who entered their security perimeter just as a SWAT team was preparing to enter an apartment. 544 F.3d at 818 (stating that police were "reasonably concerned for their own and for Jennings's safety"). In so holding, the court cited approvingly to cases from other circuits that have held that police are permitted to detain people who approach a premises where a search is in progress:

> For example, in *United States v. Bohannon*, the Sixth Circuit upheld as reasonable the detention of a man who drove into the driveway of a suspected methamphetamine lab while a search was underway. 225 F.3d 615, 616 (6th Cir. 2000). The man got out of his car and walked toward the residence, and the court held that detaining him was reasonably necessary to protect the officers conducting the search, and that the man's arrival at a residence that housed a drug lab made it reasonable for the officers to suspect that he too was involved in criminal activity. *Id.* at 617. Similarly, in *Baker v. Monroe Township*, the Third Circuit held that it was reasonable for officers to detain dinner guests who knocked on the door of a house where the police were conducting a search. 50 F.3d 1186, 1188–89 (3d Cir.1995). Because the officers knew that drug customers regularly came and went from the house, the court concluded that it was reasonable for the police to stop and ascertain the identity of anyone approaching it during the search. *Id.* at 1191–92.

*Jennings*, 544 F.3d at 818. (The court in *Baker* also concluded that the officers' conduct was permissible under the line of cases following *Terry v. Ohio*, 392 U.S. 1 (1968). 50 F.3d at 1192.) The detentions of the individuals in *Bohannon* and *Baker* were considered reasonable because suspicion had attached to them through their contact with the places where searches were in progress, and because officer safety was a legitimate concern. The Defendant distinguishes his connection to the Euclid Street house on grounds that he had already left the house about to be searched. While the Defendant is correct that this distance from the house may have lessened any safety concerns facing the officers who were going to execute the warrant, this addresses only

11

one justification for the detention. The Defendant being ten blocks away from the house did nothing to diminish the basis upon which the police suspected that the Defendant was engaged in criminal activity.

On that point, the police had a much stronger basis to suspect that the Defendant was involved in criminal activity than his mere arrival at the scene of a drug raid. First, his connection to the house had already been established by police observation of his presence at the house four times over the course of eleven days (from November 21 to December 2). Thus, if criminal activity was going on inside the house—as contemplated by the search warrant—he was implicated in this activity by his connection to the house, regardless of whether he actually resided at that house or somewhere else. Second, the Defendant's own actions had provided the basis for the probable cause to believe that evidence of illegal drug trafficking would be found at the Euclid residence. On the basis of activity that the police observed the Defendant undertake on more than one occasion and as recently as the previous day, police had an objectively reasonable basis to believe that the Defendant was engaged in criminal activity, and that a search of the house the Defendant just left would reveal evidence of his criminal conduct. In fact, unlike the scenario in *Summers* and cases that have applied its holding, it was not the Defendant's mere connection to a house the police (and a judicial officer) suspected harbored contraband that gave police a basis to suspect that he was engaged in criminal activity. Rather, it was the Defendant's conduct (in which he had engaged immediately upon leaving the house) that justified the suspicion that the house contained contraband. Thus, the fact that the Defendant had driven ten to fifteen blocks away from that house does not diminish the evidence supporting Vice and Narcotics officers' suspicion that he was involved in criminal activity, specifically possession

with intent to distribute drugs and related crimes.

In addition to having an articulable basis to believe that the Defendant was engaged in drug trafficking, the police had a legitimate interest in preventing the Defendant's flight. After the police conducted a traffic stop of the vehicle in which the Defendant was a passenger, he was alerted that officers were conducting a search of the residence at 2815 Euclid Street. Given his connection with the residence over the previous eleven days and on that particular day, the police were justified in believing that he may attempt to avoid apprehension if they discovered incriminating evidence, and his detention served the interest of preventing such flight. This reasonably held belief was not dependent on whether the nature and frequency of his contacts with the house were characterized as that of a visitor, occupant, or resident. The Defendant asserts that risk of flight could not have been a legitimate police concern because he was not aware of the warrant before the police stopped the Impala. But the Defendant was riding in a vehicle with the resident of the house to be searched, and she did not have a valid driver's license. Thus, it was reasonable and proper for police to conduct a traffic stop, inform Wilhelm of the search, and obtain her keys to facilitate the search and to avoid a forced entry. The Defendant's knowledge of the search became virtually unavoidable at that time.

Having determined that the police had justifiable reasons to detain the Defendant upon suspicion that he was engaged in dealing drugs, and for fear that he would engage in flight, the Court must also consider the nature of the intrusion and whether it exceeded the scope of an investigatory stop or the limited detentions that are considered reasonable in connection with the execution of a search warrant. The Defendant's arguments about his distance from the house and his connection with the house are relevant to this inquiry. Because the Defendant was stopped in

a car several blocks away from the house that he was transported to during the bulk of his detention, it was more intrusive than that of a resident who is already in his home that is being searched pursuant to a warrant. *Cf. Summers*, 452 U.S. at 701. Nevertheless, the detention did not exceed the bounds of an investigative stop based on reasonable suspicion. Given the articulable facts to support the suspicion that the Defendant intended to sell drugs when he left the Euclid Street residence, and the fact that a search was already being conducted that could uncover evidence of such criminal activity, it was not unreasonable for the police to detain him during their search. In addition, Wilhelm admitted during the traffic stop that she had marijuana in the house, providing further basis to suspect that the Defendant had been engaged in criminal activity and that the search would uncover evidence to support criminal charges.

The detention was not unreasonably prolonged. The time between the traffic stop and the discovery of evidence providing probable cause to arrest the Defendant was about thirty minutes. As the *Summers* Court noted, detention during the execution of a search warrant "is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." *Summers*, 452 U.S. at 701–02. Such was the case here. The police did not question the Defendant, but diligently pursued a means of investigation that was most likely to resolve the matter—a means they had been authorized to pursue by a neutral and detached magistrate. Moving the Defendant from the location of the traffic stop to the house ten to fifteen blocks away did not convert his detention to an arrest. *Cf. United States v. Yang,* 286 F.3d 940, 950 (7th Cir. 2002) (holding that transporting defendant to a different airport terminal did not convert stop into an arrest.) It did not increase the nature of the intrusion to require the Defendant to wait

14

outside the residence being searched as opposed to staying parked down the street. In either case he would have been confined to the back of a squad car. Additionally, police officers do not convert a *Terry* stop into a full custodial arrest just by handcuffing the subject. *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007) (citing *United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004), and *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994)).

The Court finds that the character of the police intrusion and its justification were reasonable under the Fourth Amendment.

**B.     Arrest**

Indiana's Common Nuisance statute makes it a Class B misdemeanor for any person to "knowingly or intentionally visit[ ] a building, structure, vehicle, or other place that is used by any person to unlawfully use a controlled substance." Ind. Code § 35-48-4-13. The Defendant argues that the police did not have probable cause to arrest him for visiting a common nuisance because the offense requires that the offender know that drugs are being unlawfully used at the location on multiple occasions. (Def.'s Brief 12, citing *Hale v. Hale*, 785 N.E.2d 641 (Ind. Ct. App. 2003). ) The Defendant argues that probable cause was not established simply because he was previously inside a house where drugs were later discovered. He maintains that there was no evidence that drugs were being used at the residence, that they had been used on more than one occasion, or that the Defendant was aware of any drugs.

Police officers have probable cause to make an arrest where "the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [suspect] had committed or was

15

committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The police had knowledge that the Defendant had been at the 2815 Euclid Street address on several occasions. On the day of his arrest, he testified that he arrived at the Euclid Street address at around 7:00 AM and then left with Wilhelm around 2:00 in the afternoon. The police discovered a lighter next to a box of marijuana on the living room table. The reasonable inference is that the marijuana was smoked inside the house. Probable cause did not require that police actually show that the Defendant was aware of these drugs and their use. *See Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983) ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."); *United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000) ("Probable cause . . . does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime . . . [s]o long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists"). A common sense view of the everyday realities of life would suggest to police that the Defendant was aware that the woman whom he had visited on numerous occasions, and where he had just spent the last seven hours, used drugs inside her home.[3] The police also discovered evidence of more widespread, continuous, and recurrent drug activity. That police could not be certain that the Defendant was aware of the drugs, or how often they were used inside the house, does not negate probable cause, which "does not require evidence sufficient to support a conviction." *Sawyer*, 224 F.3d at 679.

---

[3] The record does not suggest that the police were aware of the exact amount of time that the Defendant spent inside the house on December 2, but they did not know that he had been inside with Wilhelm before leaving with her that afternoon prior to his arrest, and that he had spent time at the house on other occasions.

Accordingly, the police had probable cause to arrest the Defendant for visiting a common nuisance and were justified in searching him incident to this arrest. *See United States v. Jackson*, 377 F.3d 715, 716 (7th Cir. 2004) ("[I]t is reasonable for the police to search the body, clothing, and immediate possessions of anyone in custody following an arrest on probable cause." (citing *Gustafson v. Florida*, 414 U.S. 260 (1973), and *United States v. Robinson*, 414 U.S. 218 (1973)).

## CONCLUSION

For the forgoing reasons, the Defendant's Motion to Suppress Evidence [DE 15] is DENIED, and the Stipulation [DE 34] is terminated as a pending motion. A trial is scheduled to begin at 8:30 AM on Tuesday, December 15, 2009, before Judge Theresa L. Springmann. A telephonic Final Pretrial Conference is scheduled for Monday, December 7, 2009, at 1:30 PM before Judge Theresa L. Springmann. The Court will initiate the call. The Clerk is DIRECTED to RESTRICT ACCESS of this Opinion and Order to Case Participants only.

SO ORDERED on November 20, 2009.

                                                 s/ Theresa L. Springmann
                                                 THERESA L. SPRINGMANN
                                                 UNITED STATES DISTRICT COURT